**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NORMA CHASE,** | : | |
| **Plaintiff** | : | **Civil Action No. 1:05-CV-2375** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **PUBLIC UTILITY COMMISSION** | : | |
| **OF PENNSYLVANIA et al.,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Before the Court are Defendants' motion for judgment on the pleadings and Plaintiff's

motion for summary judgment.  (Doc. Nos. 66, 81.)  For the reasons that follow, the Court will

grant judgment in Defendants' favor.

**I.      BACKGROUND**

Plaintiff, Norma Chase, brought this action against the Pennsylvania Public Utility

Commission and individual Commissioners (collectively, the "PUC") to challenge the PUC's

policy regarding the dissemination and copying of transcripts of public hearings.  After two

amendments to the complaint (Doc. Nos. 27, 33), the Court granted in part and denied in part

Defendants' motion to dismiss the second amended complaint (Doc. No. 62).  The PUC

thereafter filed an answer (Doc. No. 63), and moved for judgment on the pleadings (Doc. No.

66).  The parties then submitted a joint stipulation of facts (Doc. No. 73) and exhibits supporting

the stipulation (Doc. No. 72).  Chase submitted, pursuant to Court order (Doc. No. 76), a motion

for judgment as a matter of law (Doc. No. 81), based upon the stipulated facts.  The parties

briefed the motions (Doc. Nos. 67, 83, 87), which are ripe for disposition.

II.     **FINDINGS OF FACT**[1]

1.      On January 13, 2005, the PUC held a public meeting. (S. ¶ 1; Ex. 1.)

2.      In September 2005, Chase requested a transcript of the meeting from the PUC.

3.      The PUC refused to make copies, indicating that Chase would need to contact the

        Commonwealth Reporting Company ("Reporting Agency") in order to obtain a

        copy.  (S. ¶ 2.)

4.      The PUC indicated that Chase would be "permitted to view the transcript [at the

        PUC] and even take your own notes but we are not permitted to make you copies

        from the transcript."  (S. ¶ 2.)

5.      Based upon a rate of $2.80 per page and thirty-one billable pages, the cost of

        purchasing the transcript from the Reporting Agency would have been $86.80.  (S.

        ¶ 3.)

6.      On October 31, 2005, Chase formally requested a photocopy of transcript from the

        PUC at the "cost of copying."  (S. ¶ 4.)

7.      The PUC declined Chase's request, citing its policy to refer requests for

        transcripts to the Reporting Agency.  (S. ¶ 6.)  That policy is reflected on the

        PUC's website, which states that "[t]he PUC does not handle transcripts from

        public meetings or hearings.  You must contact the court reporting firm.  For

        copies of transcripts, please contact the appropriate [Reporting Agency]."  (Ex. 2.)

8.      The PUC entered into a contract with the Reporting Agency, under which the

---

[1] The following findings of fact are based upon the parties' joint stipulation of facts (Doc. No. 73), which will be referred to as "S.", and the exhibits submitted to the Court (Doc. No. 72).

Reporting Agency agreed to provide transcribing services to the PUC.  As part of the contract, the PUC reserved the right to make copies of the transcripts for internal use, but agreed that it would not "supply transcripts . . . except [in limited circumstances], unless ordered to do so by court order."  The contract also stated that "[b]ecause the transcript will, in some cases, be a public record, any member of the general public shall be permitted to examine a transcript unless [the hearing was closed or the record was sealed].  If a member of the general public requests a copy of the transcript, the requesting party shall be directed to the [Reporting Agency] for the purchase of the copy . . . .  In any event, however, after 5 years, transcripts will be deemed to have entered the public domain.  As such, the Commonwealth shall have the right to provide copies of any transcripts 5 years old or older to any interested person for the amount per page rate as fixed by the Commonwealth."  (Ex. 4, at 1, 7.)

9.     Under the Contract, the Reporting Agency agreed that it would place the following statement on the cover page of its transcripts: "Any reproduction of this transcript is prohibited without authorization by the certifying agency."  (Ex. 3, at 6.)  The transcripts, in fact, included such a statement.  (S. ¶ 9.)

10.    For documents other than transcripts, the PUC charges 75 cents per page for public-record documents.

## III.   DISCUSSION

Chase's challenge to the PUC policy presents two succinct legal issues.  The first is whether the PUC policy is preempted by the express-preemption provision of federal copyright

3

law, 17 U.S.C. § 301.  Subsumed within this issue is whether Chase may maintain a cause of

action against the PUC under § 301.  The second issue presented is whether the PUC policy

deprives Chase of her First Amendment rights.  The Court will address each in turn.

     **A.**       **Private right of action**

At the outset, the Court must determine whether federal law provides Chase with a

private right of action to challenge the PUC policy as preempted by the Copyright Act.  As

discussed below, the Court finds that it does.

Chase argues that "[t]he starting point for the analysis is 42 U.S.C. § 1983," which may

be invoked to enforce rights guaranteed by federal statute, Maine v. Thiboutot, 448 U.S. 1, 4

(1980).  Supreme Court jurisprudence requires, however, that before a plaintiff may invoke

§ 1983 to enforce a federal right, the plaintiff must show that the federal statute in question—in

this case, 17 U.S.C. § 301—creates "an individually enforceable right in the class of beneficiaries

to which [a plaintiff] belongs."  City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 120

(2005) (citing Gonzaga Univ. v. Doe, 536 U.S. 273, 285 (2002)).  Upon finding such a right, a

defendant may rebut the presumption that such a right is enforceable "demonstrating that

Congress did not intend that remedy for a newly created right."  Id. (citing Blessing v. Freestone,

520 U.S. 329, 341 (1997)).

In this case, Chase advances the argument that § 301 guarantees an individual right to

copy works in the public domain by restricting the state's ability to create a "monopoly."  The

PUC lodges no formal disagreement to Chase's contention, beyond admitting that the public-

hearing transcripts in question do not fall within the subject matter of federal copyright.  To this

Court's knowledge, there are no decisions holding that § 301 creates individually enforceable

rights.  In most cases, § 301 preemption is raised as a defense rather than a substantive right.

Fortunately, the Court need not resolve whether § 301 creates the type of individual right

necessary to invoke § 1983, because an implied cause of action can be readily found in a

different source: the Supremacy Clause.

It is well-established that a plaintiff may seek injunctive and declaratory relief to

invalidate a state regulation that is preempted by federal law.  Planned Parenthood of Houston &

Se. Texas v. Sanchez, 403 F.3d 324, 333-35 (5th Cir. 2005) ("[T]he rule that there is an implied

right of action to enjoin state or local regulation that is preempted by a federal statutory or

constitutional provision--and that such an action falls within the federal question jurisdiction--is

well-established.") (quoting Richard H. Fallon, Daniel J. Meltzer & David L. Shapiro, Hart &

Wechsler's The Federal Courts & The Federal System 903 (5th ed. 2003)); see also Qwest Corp.

v. City of Santa Fe, 380 F.3d 1258, 1266 (10th Cir. 2004) ("A federal statutory right or right of

action is not required where a party seeks to enjoin the enforcement of a regulation on the

grounds that the local ordinance is preempted by federal law.").  Indeed, the Supreme Court has

noted that "[a] plaintiff who seeks injunctive relief from state regulation, on the ground that such

regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the

Constitution, must prevail, thus presents a federal question which the federal courts have

jurisdiction under 28 U.S.C. § 1331 to resolve."  Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96

n.14 (1983).

Here, because Chase seeks relief solely in the form of a declaration that the PUC policy

"violate[s] the First Amendment to the United States Constitution and the copyright laws of the

United States"[2] (Second Am. Compl. ¶ 26), the Court has little difficulty in concluding that this

Court has jurisdiction in this case, and that an implied cause of action exists under the

Supremacy Clause.

### B.    Preemption

Turning to the merits of Chase's copyright claim, the Court's Supremacy Clause analysis

must begin "with the assumption that the historic police powers of the States are not to be

superseded by Federal Act unless that is the clear and manifest purpose of Congress." Cipollone

v. Liggett Group, 505 U.S. 504, 516 (1992) (internal quotations omitted).  Congress's purpose

may be evidenced either "by express language in a congressional enactment, by implication from

the depth and breadth of a congressional scheme that occupies the legislative field, or by

implication because of a conflict with a congressional enactment." Lorillard Tobacco Co. v.

Reilly, 533 U.S. 525, 541 (2001) (internal citations omitted).  A federal law thus may preempt

state action in one of three ways: (1) express preemption; (2) field preemption; or (3) conflict

preemption. Orson, Inc. v. Miramax Film Corp., 189 F.3d 377, 381 (3d Cir. 1992).  Chase

argues that § 301 of the Copyright Act expressly preempts PUC policy.[3]  This Court cannot so

---

[2] In her omnibus brief, Chase explicitly withdrew her claim for counsel fees.  (Doc. No.
83, at 3.)

[3] Chase does not squarely raise the issue of conflict preemption in her briefs, and the
Court is of the opinion it would not apply.  Conflict preemption forecloses state actions that
conflict with federal law either because "compliance with both regulations is a physical
impossibility" or because the state law "stands as an obstacle to the accomplishment and
execution of the full purposes and objectives of Congress." Orson, Inc., 189 F.3d at 382.  Here,
the PUC policy imposes no restraints on a copyright holder's rights.  Compare Orson, Inc., 189
F.3d at 385 ("It is evident that the Pennsylvania Act regulates the essence of the federally
protected copyright.").  And though the policy arguably *narrows* access to a work that is in the
public domain, for reasons discussed below, the PUC policy does not "*withdraw* any idea from
the public domain." Aronson v. Quick Point Pencil Co., 440 U.S. 257, 263 (1979) (emphasis

find.

Section 301(a) of the Copyright Act provides that:

> [A]ll legal or equitable rights that are equivalent to any of the
> exclusive rights within the general scope of copyright as specified by
> section 106 in works of authorship that are fixed in a tangible
> medium of expression and come within the subject matter of
> copyright as specified by sections 102 and 103, whether created
> before or after that date and whether published or unpublished, are
> governed exclusively by this title.  Thereafter, no person is entitled to
> any such right or equivalent right in any such work under the common
> law or statutes of any State.

17 U.S.C. § 301(a).  The purpose of § 301 "is to preempt and abolish any rights under the

common law or statutes of a State that are equivalent to copyright."  Dun & Bradstreet Software

Servs., Inv. v. Grace Consulting, Inc., 307 F.3d 197, 217 (3d Cir. 2002) (quoting H.R. Rep. No.

94-1476); Daboub v. Gibbons, 42 F.3d 285, 288 (5th Cir. 1995) ("Section 301(a) accomplishes

the general federal policy of creating a uniform method for protecting and enforcing certain rights

in intellectual property by preempting other claims.").

To demonstrate that § 301 preemption applies, the Court must consider two separate

inquiries: first, whether the works in question "come within the subject matter of copyright"; and

second, whether the rights conferred by state are "equivalent" to those rights protected by federal

copyright law.

### 1.    *The public-hearing transcripts are subject to § 301 preemption*

The PUC's sole argument with respect to preemption is that § 301 does not apply because

"[p]ublic hearing transcripts do not come within the subject matter of the Copyright Act."

_____

added) (enforcement of royalty license for unpatented invention not preempted by federal patent
law).  Accordingly, conflict preemption does not apply.

7

In order to be eligible for copyright protection, a work must be "original."  Feist Publ'ns.

v. Rural Tel. Serv. Co., 499 U.S. 340, 348 (1991) ("Originality remains the sine qua non of

copyright; accordingly, copyright protection may extend only to those components of a work that

are original to the author.").  Because the transcripts involved here are verbatim transcriptions of

public hearings, the transcriber cannot claim any "originality" in the work.  Lipman v.

Massachusetts, 475 F.2d 565, 568 (1st Cir. 1973) ("Since transcription is by definition a verbatim

recording of other persons' statements, there can be no originality in the reporter's product.").

Not surprisingly, both parties readily agree that the transcripts enjoy no copyright protection.

       The PUC thus argues that § 301 does not apply because the transcripts are not original

and cannot enjoy copyright protection.  However, the scope of § 301 is not so narrow.  Through

§ 301, Congress acted to "prevent states from giving special protection to works of authorship

that Congress has decided should be in the public domain . . . even if federal law does not afford

protection to them."  ProCD, Inc. v. Zeidenberg, 86 F.3d 1447, 1453 (7th Cir. 1996).  Indeed, the

legislative history of § 301 reflects Congress's explicit directive to that effect: "[a]s long as a

work fits within one of the general subject matter categories of sections 102 and 103, the bill

prevents the State from protecting it even if it fails to achieve Federal statutory copyright because

it is too minimal or lacking in originality to qualify, or because it has fallen into the public

domain."  H.R. Rep. No. 1476, 94th Cong., 2d Sess., 131 reprinted in 1976 U.S. Code Cong. &

Ad. News 5659, 5747; see also ATC Distrib. Group, Inc. v. Whatever It Takes Transmissions &

Parts, Inc., 402 F.3d 700, 714 (6th Cir. 2005) ("The fact that none of these works are eligible for

copyright protection under federal law does not preclude the preemption of ATC's state law

claims."); Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 919 n.15 (2d Cir. 1980) (noting that

defendant's unfair competition claim is preempted by § 301 despite the fact that the works in question lacked originality).

Based on Congress's explicit directive, the proper inquiry must focus on whether the work at issue falls within any of the general *categories* of works protected by copyright, not whether the work itself is protected. In this case, Chase correctly notes that the transcript, albeit unoriginal, meets the statutory definition of a literary work,[4] which is included within the general subject matter of copyright. As such, the Court finds that the first requirement of § 301 preemption—that the nature of the work falls within the subject matter of copyright—is satisfied.

### 2. *The PUC policy creates rights equivalent to exclusive rights within the general scope of copyright*

The next inquiry under § 301 requires the Court to discern whether the rights conferred by the state are a "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106." If state action confers a right that is functionally equivalent to a right protected under § 106, then the state action is preempted. Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1164 (1st Cir. 1994). Chase argues that the PUC policy vests an exclusive right of reproduction in the Reporting Agency. For its part, the PUC concedes the argument that its policy confers a form of proprietary right in the transcripts to the Reporting Agency despite the lack of originality sufficient to benefit from federal copyright protection. However, because the rights conferred by the PUC policy are not functionally equivalent to rights protected by federal copyright law, § 301 does not preempt the PUC policy.

---

[4] 17 U.S.C. § 101 defines a literary work as "works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia."

Section 106 grants to an owner of copyright the exclusive right to, among other things, "reproduce the copyrighted work in copies."  17 U.S.C. § 106(1).  Federal copyright law defines "copies" as "material objects . . . in which a work is fixed by any method . . . and from which the work can be perceived, reproduced, or otherwise communicated . . . ."  17 U.S.C. § 101.  Thus, the reproduction right guaranteed by § 106 ensures that a copyright owner has the exclusive right to create new material objects in which a copyrighted work may be fixed.  Nimmer on Copyright § 8.02[A].  Significantly, though, this right does not afford a copyright owner any special license to *exercise* these rights.  Instead, copyright law permits a copyright owner to *prevent others* from exercising those rights.  Thus, when a work is protected by copyright, only the copyright owner, or someone authorized by the owner to do so, may make reproductions.  By contrast, when a work falls outside the ambit of copyright protection, either because it is not within the subject matter of copyright or because it is within the "public domain," any person may reproduce a work freely.

Chase argues that the PUC policy runs afoul of § 301 because the terms of the contract between the PUC and the Reporting Agency creates a right that is functionally equivalent to an exclusive right of reproduction.  Chase, however, fundamentally overstates the "right" created by the PUC.  Although the policy deprives an individual of the ability to purchase the transcripts directly from the PUC, it vests no legal or equitable right in the Reporting Agency.  Nothing prohibits any individual from making a verbatim copy of the work.

More must be said, however, because the contract between the PUC and the Reporting Agency requires the Reporting Agency to include the following notice on each of the transcripts: "Any reproduction of this transcript is prohibited without authorization by the certifying agency."

10

(Ex. 3, at 6.)  Worse, the contract provides that:

> Because the transcript will, in some cases, be a public record, any member of the general public shall be permitted to examine a transcript unless [the hearing was closed or the record was sealed]. If a member of the general public requests a copy of the transcript, the requesting party shall be directed to the [Reporting Agency] for the purchase of the copy. . . .  In any event, however, after 5 years, transcripts will be deemed to have entered the public domain.  As such, the Commonwealth shall have the right to provide copies of any transcripts 5 years old or older to any interested person for the amount per page rate as fixed by the Commonwealth.

(Ex. 4, at 7.)

These provisions are troubling because, on their face, they appear to establish a monopoly in the distribution of transcripts.   Yet what is dispositive for § 301 purposes is whether the policy creates any "legal or equitable rights."  In this respect, ProCD Inc. v. Zeidenberg, 86 F.3d 1447 (7th Cir. 1996), a decision from the Seventh Circuit is instructive.  Plaintiff, ProCD, compiled a database of telephone directories, which it licensed to customers at varying prices.  Because the database presumably fell outside the scope of copyright protection, ProCD employed the use of "shrinkwrap" licenses in order to maintain the price differential between commercial and non-commercial users of the database.  These shrinkwrap licenses prohibited the resale of the database.  Defendant Zeidenberg, an arbitrageur, ignored these licenses and sold the database to commercial customers at a reduced rate.  When ProCD sued for breach of contract, Zeidenberg argued that ProCD's breach of contract claim was preempted by federal copyright law.

The Seventh Circuit rejected Zeidenberg's argument, holding that the shrinkwrap license did not create rights "equivalent" to the exclusive rights protected under copyright.   Rather, the court explained:

Rights 'equivalent to any of the exclusive rights within the general scope of copyright' are rights established *by law* – rights that restrict the options of persons who are strangers to the author. Copyright law forbids duplication, public performance, and so on, unless the person wishing to copy or perform the work gets permission; silence means a ban on copying. Contracts, by contrast, generally affect only their parties; strangers may do as they please, so contracts do not create "exclusive rights." Someone who found a copy of [the database] on the street would not be affected by the shrinkwrap license – though the federal copyright laws of their own force would limit the finder's ability to copy or transmit [it].

Id. at 1454 (emphasis in original).

As in ProCD, by channeling requests for transcripts through a Reporting Agency and requiring the Reporting Agency to limit the ability of an individual to reproduce a transcript, the PUC policy arguably reduces access to works in the public domain.[5]  Importantly though, like in ProCD, nothing in the PUC policy affects a *stranger's* ability to reproduce or transmit copies of the transcripts.  In other words, the right conferred to the Reporting Agency is not a right established by *law*, only by contract.  As such, the PUC policy does not create legal or equitable rights equivalent to the right of reproduction, and therefore § 301 does not apply.

## C.    First Amendment

Chase next argues that the PUC policy deprives her of her First Amendment right to access and copy public documents.  The Court cannot agree.

One of the central features undergirding American government is the premise that the functioning of government is a public affair.  Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597-98 (1978) (recognizing a common-law right to inspect and copy judicial records arising from "the citizen's desire to keep a watchful eye on the workings of public agencies, and in a

_____

[5] The Court need not resolve this issue, however, as it is not presently before the Court.

newspaper publisher's intention to publish information concerning the operation of government.").  The First Amendment, which provides in relevant part that "Congress shall make no law . . . abridging the freedom of speech, or of the press," U.S. Const. amend. I, advances that principle by "ensur[ing] that the individual citizen can effectively participate in and contribute to our republic system of self government," Globe Newspaper Co. v. Super. Ct. for the County of Norfolk, 457 U.S. 596,604 (1982).  Recognizing the importance of public oversight of government, courts have held that the First Amendment embraces an implicit "right of access" to certain governmental proceedings, such as criminal trials.  Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580 (1980); Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1070 (3d Cir. 1984) (First Amendment guarantees right of access to civil trials).  This qualified right of access to government proceedings attaches where "the place and process have historically been open to the press and general public" and where "public access plays a significant positive role in the functioning of the particular process in question."  N. Jersey Media Group, Inc. v. Ashcroft, 308 F.3d 198, 209 (3d Cir. 2002) (quoting Press-Enter. Co. v. Super. Ct. of Cal. for the County of Riverside, 478 U.S. 1, 8 (1986)).

Neither Chase nor the PUC question whether the First Amendment guarantees a right of access to the PUC transcripts at issue, and the Court will not consider it sua sponte.  Rather, the Court will assume for the sake of this opinion that Chase enjoys qualified right of access to the PUC hearing and the transcripts of that hearing.

However, any qualified right of access is not absolute.  Globe Newspaper, 457 U.S. at 606; Whiteland Woods, L.P. v. Twp. of West Whiteland, 193 F.3d 177, 182 (3d Cir. 1999) ("[T]he First Amendment does not require unfettered access to government information.").  Even

13

if the First Amendment guarantees access to the PUC transcripts, it does not mandate access to the government information "in a particular form, as long as the information sought is made available as required by the First Amendment." Putnam Pit, Inc. v. City of Cookeville, 221 F.3d 834, 841 (6th Cir. 2000). Nor does the First Amendment require Pennsylvania to "accommodate every potential method of recording its proceedings, particularly where the public is granted alternative means of compiling a comprehensive record." Whiteland Woods, 193 F.3d at 183. Rather, as the Supreme Court has noted, government entities may impose "reasonable limitations" on the First Amendment right of access. Richmond Newspapers, 448 U.S. at 581 n.18. Such limitations, however, must not "deny or unwarrantedly abridge the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." Id.

Here, the PUC permits substantial access to the PUC hearing transcripts.[6] The PUC permits virtually unlimited inspection of the transcripts, note-taking, and even verbatim reproductions of the transcript. The only meaningful limitation at issue is the price that the Reporting Agency charges for printing a copy of the transcript. Yet, the First Amendment does not demand expediency or economy; it demands meaningful access, which the PUC has provided. Although the Court appreciates Chase's frustration with the Reporting Agency's assertion of a "proprietary interest" in the transcripts, there simply is no authority to support the proposition that the First Amendment compels at-cost reproductions of the public-hearing transcript. Instead, the Court is guided by the Third Circuit's recognition that:

> [D]ecisions as to how much governmental information must be

_____

[6] Presumably, Chase also had unfettered access to the public hearing itself.

> disclosed in order to make democracy work historically have been
> regarded as political decisions to be made by the people and their
> elected representatives.  Conversely, the judiciary has never asserted
> the institutional competence to make such decisions.  The reason
> seems apparent.  Neither the free speech clause nor the structure of
> the government described by the Constitution yields any principled
> basis for deciding which government information must be made
> available to the citizenry and which need not.

Capital Cities Media, Inc. v. Chester, 797 F.2d 1164, 1171 (3d Cir. 1986).  Despite Chase's

vigorous challenge, the PUC policy withstands constitutional scrutiny, and therefore the Court

will grant judgment in Defendants' favor.

**IV.     CONCLUSIONS OF LAW**

1.     A plaintiff may bring an action for declaratory and injunctive relief against a state

actor to challenge the enforcement of a state action preempted by 17 U.S.C. § 301

under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI,

§ 2.

2.     The PUC policy is not preempted by 17 U.S.C. § 301 because the policy does not

create "legal or equitable rights that are equivalent to any of the exclusive rights

within the general scope of copyright."

3.     The PUC policy does not deprive Plaintiff of rights conferred under the First and

Fourteenth Amendments.

**V.     CONCLUSION**

For the foregoing reasons, Defendants' motion for judgment as a matter of law will be

granted.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NORMA CHASE,** | : | |
| **Plaintiff** | : | **Civil Action No. 1:05-CV-2375** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **PUBLIC UTILITY COMMISSION** | : | |
| **OF PENNSYLVANIA et al.,** | : | |
| **Defendants** | : | |

## ORDER

 **AND NOW**, on this 31st day of March, 2008, for the reasons set forth in the

accompanying memorandum, **IT IS HEREBY ORDERED THAT** Plaintiff's motion for

judgment as a matter of law (Doc. No. 81) is **DENIED** and Defendants' motion for judgment as

a matter of law (Doc. No. 66) is **GRANTED**.  The Clerk shall enter judgment in Defendants'

favor.


                                              s/ Yvette Kane
                                              Yvette Kane, Chief Judge
                                              United States District Court
                                              Middle District of Pennsylvania